# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| ARTHUR WEST,<br><br>     Appellant,<br><br> v.<br><br>CITY OF TACOMA,<br><br>     Respondent. | No.  51487-7-II<br><br><br><br>PUBLISHED OPINION |

WORSWICK, J. — In 2014, Arthur West made a request under the Public Records Act
(PRA), chapter 42.56 RCW, to the City of Tacoma and the Tacoma Police Department (TPD)
(collectively, the City) regarding its cell site simulator (CSS) technology.[1]  The City provided
records to West, some of which were redacted.  West filed this action, alleging that the City
wrongfully failed to produce responsive records and improperly redacted other records.  West
and the City filed cross motions for summary judgment.  The trial court ruled that the redactions
met the PRA's specific intelligence information exemption but that the City wrongfully withheld
a set of e-mails under an incorrect interpretation of attorney-client privilege.  The trial court
imposed a PRA penalty on the City for the withheld e-mails and dismissed West's other claims.

---

[1] CSSs mimic wireless carrier cell towers.  A CSS can force all nearby mobile phones and other
cellular data devices to connect to it, collecting signaling information from these devices.  A CSS
can also locate a specific cellular device based on that device's previously acquired signaling
information.  This type of surveillance technology is also commonly referred to as an "IMSI-
catcher" or a "Stingray device," although the StingRay is only one model of an IMSI-catcher
manufactured by Harris Corporation.  Clerk's Papers (CP) at 149 n.2, 152.

We hold that the information redacted by the City does not meet the specific intelligence information exemption, the trial court erred by granting the City's motion for summary judgment because a material issue of fact existed regarding two documents, and the City did not conduct an adequate search for responsive records. Because we reverse the trial court, we do not reach whether the trial court erred when determining the PRA penalty. Thus, we affirm in part, reverse in part, and remand for further proceedings.

FACTS

I. FACTUAL HISTORY

This case involves five groups of records West claims were either not provided or were improperly redacted in response to his 2014 public records request. These groups are: (1) redacted invoices, purchase orders, a shipping document, and quotations noted in the 2014 privilege log (Invoice documents); (2) claimed attorney-client privilege e-mails noted in the 2015 privilege log (Attorney-Client Privilege e-mails); (3) a Port Security Grant Upgrade and an August 12, 2014 Harris Corporation quotation noted in the 2015 privilege log (Grant Upgrade documents); (4) 74 pages of e-mails produced to a third party, related to the City's public response to CSS technology inquiries; and (5) six pages of e-mails labeled "Christopher," related to the City's public response to CSS technology inquiries (Christopher documents).

A.    *The City's CSS Technology*

In 2013, TPD purchased CSS technology. As a prerequisite to obtaining this technology, TPD entered into a nondisclosure agreement with the Federal Bureau of Investigation (FBI). The nondisclosure agreement prevented TPD from disclosing the existence of CSS technology to

the public. Further, TPD was prevented from disclosing any information about CSS technology without prior approval from the FBI. The nondisclosure agreement also required TPD to consult with the FBI before disclosing information regarding CSS technology, allowing "sufficient time for the FBI to seek to prevent disclosure through appropriate channels."[2] Clerk's Papers (CP) at 165.

In 2014, the City began fielding requests for records related to CSS technology. After a news outlet published a story about the City's CSS technology, the City received additional records requests on the subject. West was one such requester.

B. *West's 2014 Request*

On August 28, 2014, West submitted a PRA request to the City. West requested:

1. Any records of any purchase or use agreement of, or for, a cell site simulator or stingray device.

2. All records and communications concerning the use or assignment of officers to operate any such device.

3. Any index, list or log of information intercepted by any such device.

4. Any records released in response to any previous request or requests for stingray related records.

5. Any records concerning any agreements, policies, procedures, or understandings related to the acquisition, use, or operation of stingray technology.

CP at 9.

---

[2] TPD disclosed a redacted version of the nondisclosure agreement in 2014 and an unredacted version in 2015. The nondisclosure agreement is not at issue in this appeal.

Deputy City Attorney Michael Smith conducted the records search for West's 2014 request. Smith interpreted West's 2014 request as seeking documents specifically related to the "acquisition, use, and operation of the equipment," and the City provided only those documents to West. CP at 880. Regarding West's 2014 request, Smith contacted Chief Don Ramsdell, Assistant Chief Kathy McAlpine, Jeanette Blackwell, Lieutenant Christopher Travis, and Detective Terry Krause.

Because West's 2014 request was one of many for CSS information during that time period, and in accordance with the nondisclosure agreement, Smith had been in contact with the FBI regarding particular CSS information the FBI wanted redacted. Smith "was keenly aware of the potential ramifications of breaching our contract with the FBI" because TPD could have lost its CSS equipment and future FBI cooperation.

The City responded to West's request by providing documents, some of which, namely the Invoice documents, were redacted. Specifically, these documents included a Harris Corporation Quotation from February 2013, City of Tacoma purchase orders, an invoice and shipping document, and a Harris Corporation invoice. The 2014 privilege log stated that the redacted information was "[s]pecific intelligence information[,] the nondisclosure of which is essential for effective law enforcement." CP at 11. The redactions withheld the make, model, and pricing information of CSS equipment, including equipment purchased by the City, but also equipment otherwise available for purchase. The City considered West's request closed on November 4, 2014.

4

C.    *West's 2015 Request*

In 2015, West made another PRA request to the City regarding CSS technology. Although West's 2015 request is not the subject of this appeal, the 2015 request uncovered the Attorney-Client Privilege e-mails and the Grant Upgrade documents at issue in this case. West's 2015 request sought, in relevant part, "[a]ll communications concerning, and records relating to, the withholding of, or the production of an unredacted copy of, the non-disclosure agreement[.] . . . Any records released in response to any previous request or requests for stingray related records." CP at 824.

Smith also conducted the search for West's 2015 request. The City provided documents and privilege logs to West. The 2015 privilege log identified the Attorney-Client Privilege e-mails which were withheld under an attorney-client privilege PRA exemption. The 2015 privilege logs also identified the Grant Upgrade documents.

Smith's interpretation of West's 2014 request did not include the e-mails the City provided to West in response to his 2015 request. Smith stated that the e-mails disclosed in 2015 concerned the City's response to a newspaper article about CSS technology and how the City's response needed to comply with its nondisclosure agreement. Smith believed that West's 2014 request sought only records "concerning the acquisition, use, and operation of [CSS] technology." CP at 781. Smith did not view the e-mails as responsive to West's 2014 request because those e-mails did not concern the acquisition, use, or operation of the equipment.

II. Procedural History

West filed the instant complaint regarding his 2014 request, alleging that the City violated the PRA "by unreasonably delaying or denying disclosure of records, failing to produce records, failing to conduct a reasonable search and failing to assert valid and lawful exemptions in a valid privilege log." CP at 3. West sought the release of all requested records without redaction. Attached to his complaint was the 2014 privilege log that identified invoices, quotations, purchase orders, and shipping documents. In the log attached to West's complaint, the City claimed the redacted information was exempt from disclosure because it contained specific intelligence information.[3]

West sent an e-mail to the City on January 31, 2017, proposing to note a motion for "the 3rd" and to "limit[] the records at issue to the [nondisclosure agreement], and the estimates, invoices and purchase order type records . . . ." CP at 712. It appears from our record on appeal that the City did not respond to West's e-mail.

Both parties filed motions for summary judgment. West filed his motion for partial summary judgment on January 31, 2017, arguing that particular records were wrongfully withheld or redacted regarding his 2014 request. Specifically, West argued that the City (1) failed to identify or produce the Attorney-Client Privilege e-mails; (2) silently withheld the Grant

---

[3] The 2014 privilege log also noted that a quotation and an invoice contained financial account numbers. The City redacted this information under RCW 42.56.230(5), which exempts bank or financial information from disclosure. Because the parties do not raise or argue the claimed financial account numbers exemption, the financial account numbers noted in the 2014 privilege log are not germane to this appeal.

Upgrade documents; and (3) silently withheld "[a] number of Email communications responsive to the request for records" in response to his 2014 request (the 74 pages of e-mails).  CP at 50-52.

As evidence that the City's response to his 2014 request was inadequate, West attached the privilege log from his 2015 request, which identified the Attorney-Client Privilege e-mails and the Grant Upgrade documents.  The Attorney-Client Privilege e-mails consisted of 19 e-mails in total.  Fourteen of these e-mails were generated on August 27, 2014.  The August 27 e-mails addressed the City's response to public inquiries about its CSS technology.  The other five e-mails were generated after the date of West's 2014 request.  The 2015 privilege log also notes that the Grant Upgrade documents were provided to West in redacted form.

The United States filed a "Statement of Interest of the United States,"[4] accompanied by an affidavit from FBI Supervisory Special Agent Russell Hansen that explained the FBI's position on disclosure of the information West sought.  CP at 131.  In the affidavit, Hansen stated that CSSs are important tools for national security and that the CSS devices and technical information about CSSs, such as their design, assembly, and operation, are prohibited from export without Department of State authorization because they are defense articles.  Hansen stated that the federal government has a strong interest in preventing the disclosure of "technical and operation information about cell-site simulators and their use."  CP at 153.  Hansen further

---

[4] The United States submitted this document under 28 U.S.C. § 517, which authorizes the Attorney General of the United States to send any officer of the Department of Justice to "attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

stated that the disclosure of product or software names would allow criminals or terrorists "to accumulate information and draw conclusions about the use and technical capabilities of the technology," which would allow these bad actors to evade law enforcement efforts. CP at 155.

Specifically regarding West's 2014 request, Hansen stated that the FBI asked TPD to redact records related to CSS make and model information, and purchasing CSS equipment, components, software, and training. Hansen stated that disclosure of make and model information, as well as system components, would reveal TPD's CSS capabilities and weaknesses because other information already available would allow criminals to piece together "heat maps" of areas where specific CSS technology is operated. CP at 156. Hansen acknowledged that disclosing an operator's manual would reveal "detailed technical information, as well as information that would tend to reveal tradecraft (how the equipment can and is used)." CP at 157. Hansen's affidavit does not state how revealing the pricing of CSS technology would be detrimental to effective law enforcement.

The City filed its motion for summary judgment dismissal on February 16, 2017. The City argued that it had provided all responsive documents to West and that the redactions were properly exempt from disclosure. The City attached Smith's affidavit stating that when Smith responded to a PRA request, he would review the language of a request to understand what documents each requestor sought. Smith endeavored to provide each requestor every document requested, but also refrained from providing unrequested documents so as to not burden a requestor with irrelevant documents. The City also submitted redacted and unredacted copies of

the Invoice documents and the Attorney-Client Privilege e-mails for the trial court's *in camera* review.

On March 6, 2017, West filed a response to the City's motion, to which he attached 74 pages of e-mails. The 74 pages of e-mails included e-mails sent and received by Smith. West argued that these e-mails were responsive to his 2014 request, but were not disclosed by the City.

Regarding the 74 pages of e-mails, seventy-one pages of the e-mails were generated before West's 2014 request.[5] The remaining pages of e-mails were generated after West's August 28, 2014 request.

West filed a reply in support of his motion for summary judgement, attaching additional documents he believed should have been disclosed under his 2014 request. Among the documents attached to this reply were documents the parties termed the Christopher documents which the City had previously produced for a different requestor. The Christopher documents contain ten pages of e-mails from August 27, 2014. West contended that six of these pages

---

[5] These 71 pages include (1) responses to and internal discussions about responding to a Tacoma News Tribune reporter's and other news agencies' questions; (2) formulating a press release regarding the City's CSS technology; (3) communications between TPD employees and City officials and councilmembers regarding disclosure of CSS technology's function, capability, and sources of funding; and (4) internal TPD discussions regarding what the City could and could not disclose because of its nondisclosure agreement with the FBI. There are multiple distinct e-mail threads from numerous days. Some of these e-mails have the same foundational e-mail as the Attorney-Client Privilege e-mails, however, the e-mails in the 74 pages contain different responses to different people.

should have been disclosed for his 2014 request, namely Bates stamped numbers 721, 723-725, and 727-28.[6]

These six pages are all replies to an e-mail by McAlpine on August 27, 2014. McAlpine's original e-mail attempted to answer questions about the City's CSS technology from a news reporter. Krause and Loretta Cool,[7] the people who replied to the e-mail, stated they were speaking to different individuals regarding how TPD could respond to these CSS questions. Some of these Christopher documents are also in the 74 pages of e-mails. Bates No. 727 is not in the group as a separate e-mail, but is within the e-mail chain of one of the 74 pages of e-mails. Bates Nos. 725 and 728 are not included in the 74 pages of e-mails.

A.      *May Hearing on Cross Motions for Summary Judgment—Trial Court Grants West's Motion in Part, and Leaves Two Documents and PRA Penalty Determination Unresolved*

Over the course of three hearings in May, June, and September of 2017, the trial court and the parties encountered confusion and frustration regarding exactly what records were at issue in the cross summary judgment motions.

In May, the trial court addressed the cross motions for summary judgment regarding whether the City violated the PRA when it responded to West's 2014 request. At the beginning of the hearing, the trial court stated it would reserve the issue of penalties for a later proceeding, if necessary.

---

[6] West attached other documents, but on appeal, he limited his arguments to the City's withholding of these six pages.

[7] The record on appeal indicates that Cool was a public information officer with TPD.

West made a number of arguments regarding the City's records and redactions. He argued that the redactions of the Invoice documents did not meet the specific intelligence information exemption. West also argued about the documents listed on the 2015 privilege log that were missing from the 2014 privilege log, which included the Grant Upgrade documents, and the Attorney-Client Privilege e-mails. Further, West argued the City silently withheld the 74 pages of e-mails and the Christopher documents despite the records being responsive to his 2014 request.

The City argued it adequately responded to West's 2014 request. The City argued West's 2014 request was narrower than what his argument suggested because it did not ask for "communications," but asked only for records related to the acquisition, use, or operation of CSS technology. VRP (May 24, 2017) at 41. The City further argued that Smith did not need to search his e-mails because Smith was not involved with the acquisition, use, or operation of CSS technology. Additionally, the City argued that there was no evidence it had possessed 74 pages of e-mails or the Christopher documents and failed to provide them. The United States argued that the specific intelligence exemption prevents the disclosure of sensitive investigative techniques and that knowing the make and model numbers of CSS devices, combined with information currently in the public's possession, would allow criminals to circumvent law enforcement efforts.

Regarding the Grant Upgrade documents, the City represented to the trial court that it believed the Port Security Grant Upgrade was produced to West in 2014 without redactions and

that, if the City had possessed the Harris Corporation quotation from August 12, 2014 at the time of West's 2014 request, it should have been provided in redacted form.

The trial court ruled that the City's response to West's 2014 request should have included the Attorney-Client Privilege e-mails but that the City met the specific intelligence information exemption for the Invoice documents. The trial court left other issues unresolved, stating:

> I'm still concerned about the 8/12/14 [Harris Corporation] quotation, if it was given and it was redacted and they simply left it off the redaction log. I'm not sure—
> . . . .
> . . . —if that's an issue. And on this 2014 Port Security Upgrade, we don't know the date of that, so it could have been later than the request. So that's pretty much my ruling.

VRP (May 24, 2017) at 61.

Following the May hearing, both parties briefed the issue of PRA penalties regarding the Attorney-Client Privilege e-mails. Further, the City attempted to address the trial court's stated concern regarding the two Grant Upgrade documents. The City argued that it "likely did not possess" either record at the time of West's 2014 request. CP at 541. The City argued that West had failed to show that the City possessed the documents, and even if it did, the City adequately searched for records responsive to West's 2014 request. In support of this, the City attached an affidavit from Travis.

Travis stated that he searched paper and electronic documents in response to West's 2014 request and provided those records to Smith. In June 2017, Travis stated that he did not recall what records existed at the time of West's 2014 request or what records he provided to Smith. Regarding the Port Security Grant Upgrade, Travis stated that he was involved in applying for the grant through a website portal but was unsure if there were any records created until

12

September 18, 2014. Travis stated that it was possible he had some records, and that if he did, he would have provided them to Smith. Travis stated that he did not recall when he received the August 12, 2014 Harris Corporation quotation, but if he had a copy, it would have been provided.

West's reply objected to Travis's affidavit and moved to strike the City's motion because of perceived falsities and misrepresentations regarding what the trial court actually ruled on during the May hearing.

B. *June Hearing Presenting Partial Summary Judgment Order and Considering PRA Penalty—Trial Court Sets Per Diem Penalty and States It Previously Ruled Only on Attorney-Client Privilege E-mails and the Invoice Documents*

After discussing the wording of the partial order granting in part the City's motion for summary judgment, the City argued that the City "did not understand that Mr. West was arguing about 74 pages of e-mails at the hearing." VRP (June 23, 2017) at 7. The trial court replied,

> No. The only thing that I ruled on were those e-mails prior to April (sic) 28th that had to do with the preparation of the information for the newspaper.[8] That was the only thing that was in this case related to that.

VRP (June 23, 2017) at 7. The trial court further stated that this case concerned West's 2014 request and that documents that came into existence after his request were not part of the case. The trial court stated that its ruling regarding any e-mails was confined to the Attorney-Client Privilege e-mails. The trial court further stated, "The Court ruled that [West] didn't get the e-

---

[8] These are the Attorney-Client Privilege e-mails.

mails that were being generated on August 26th and 27th, just prior to [his] request, having to do with communicating to the news media about cell site simulators." VRP (June 23, 2017) at 16.

The City argued that West's complaint was "in essence" amended to conform to the evidence regarding the Attorney-Client Privilege e-mails because only the 2014 privilege log identifying the Invoice documents was attached to West's complaint. The City asked for clarity regarding whether the trial court included the Christopher documents and the 74 pages of e-mails in its summary judgement decision. The trial court responded that these sets of records were not part of the case. The trial court stated that it did not think it had said that any other records were wrongfully withheld, and that if it was wrong, parties could file a motion to revise.

The trial court ruled that the PRA penalty for the Attorney-Client Privileges e-mails would be $10 per day, but it requested further briefing regarding the calculation of penalty days. The trial court did not consider West's motion to strike, because it had not been noted, and the trial court had neither read it nor considered it. The trial court stated that the issue was moot because, "I didn't read [the affidavit] to begin with and I haven't considered it in conjunction with what we've done here today." VRP (June 23, 2017) at 31.

The trial court's written order granted partial summary judgment to the City regarding the redactions in the Invoice documents. The order stated that the court reviewed West's motion for partial summary judgment, West's response to the City's motion for summary judgment, West's reply in support of his motion for partial summary judgment, and all the declarations and attachments thereto.

14

After the trial court ruled that the City should have disclosed the Attorney-Client Privilege e-mails, the City filed an additional pleading arguing that the trial court should not have addressed these e-mails at all because these e-mails were not attached to West's complaint. The City requested that the trial court revise its ruling to address only the redactions noted in the 2014 privilege log. The City contended that the Attorney-Client Privilege e-mails were part of a different case arising from West's 2015 request. The trial court did not revise its ruling.[9]

C.      *September Hearing Setting PRA Penalty*

At the start of the September hearing, West stated that neither he nor the City were "exactly sure what the contours of [the trial court's] ruling were." VRP (September 15, 2017) at 5. The City stated that West filed documents into this case's record that should have been filed in a different case and that the City's briefing addressed some of the documents at issue in the other case because it was confused. The trial court stated, "[West's] first lawsuit was answered at a certain time, and e-mails that weren't in existence during that first lawsuit time are the e-mails that are in existence in the second lawsuit." VRP (September 15, 2017) at 14-15.

The trial court found that the City had improperly withheld records from West for 383 days. The trial court stated that it only considered and granted penalties for the e-mails that were "properly" in this case, meaning the Attorney-Client Privilege e-mails.

The trial court entered its written order granting partial summary judgment and setting the PRA per diem penalty. The order stated that it had reviewed West's motion for partial

---

[9] The City did not file a cross appeal in this case.

summary judgment, West's response to the City's motion for summary judgment, West's reply in support of his motion for partial summary judgment, and all the declarations and attachments thereto. The order also stated that the trial court considered the City's motion on penalties, but it did not state that it considered the attachment to that motion.[10] The order further stated that West's "claims as to any other documents allegedly withheld are denied." CP at 631. The trial court set the penalty at $10 per day for 383 days.

West moved for reconsideration, which the trial court denied. The trial court then filed an order claiming to dismiss West's case.[11] West filed a notice of appeal challenging both orders on summary judgment, the denial of his motion for reconsideration, and the order dismissing the case.

## ANALYSIS

### I. RECORDS AT ISSUE AND BIFURCATED HEARING

As initial matters, the City argues that three groups of records, namely (1) the Christopher documents, (2) the 74 pages of e-mails, and (3) the Grant Upgrade documents were not properly before the trial court, and that the trial court did not consider these documents when ruling at summary judgment. The City then argues that we should disregard West's arguments regarding these three groups of records. The City also argues that these records are the subject of a different case, not the case currently before this court. Further, the City contends that because

---

[10] The only attachment was Travis's affidavit.

[11] The trial court's order appears to be a pro forma order mistakenly entered on the scheduled trial date. Because dismissal was improper, we reverse the trial court's order of dismissal.

West stated in an e-mail with the City's counsel that he planned to limit his arguments to certain records, his filings containing legal arguments about the additional records were improper. West appears to argue that the trial court improperly bifurcated the PRA proceedings when it "piecemealed" its consideration of withheld documents. Br. of Appellant at 39. We disagree with both parties and consider West's arguments regarding these records on their merits.

A.      *West's Complaint*

The City appears to argue that West's complaint was insufficient to include claims regarding these three groups of records. We disagree.

Washington is a notice pleading state, meaning that a simple, concise statement of the claim and relief sought is sufficient. CR 8(a). Pleadings are to be liberally construed to allow for a decision on the merits. *State v. Adams*, 107 Wn.2d 611, 620, 732 P.2d 149 (1987). Complaints that fail to give the opposing party fair notice of the claim asserted are insufficient. *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 352, 144 P.3d 276 (2006). Unclear pleadings may be clarified during the course of summary judgment proceedings. *Adams*, 107 Wn.2d at 620.

West's complaint alleged that the City violated the PRA "by unreasonably delaying or denying disclosure of records, failing to produce records, failing to conduct a reasonable search and failing to assert valid and lawful exemptions in a valid privilege log." CP at 3. West sought the release of all requested records without redaction. Attached to his complaint was the 2014 privilege log, which identified the Invoice documents. There are no e-mails attached to West's complaint.

We hold that West's complaint gave the City fair notice that the lawsuit asserted claims regarding records in addition to those identified as redacted in the 2014 privilege log. West not only alleged that the City wrongfully failed to meet exemptions, he also alleged the City denied disclosure of records, failed to produce records, and failed to reasonably search for records. West's complaint was not limited to the redacted records identified in the 2014 privilege log. Further, West's filings at the summary judgment stage clarified the records he sought the trial court to resolve.

The City argues that because West did not have these additional records at the time he filed his complaint, these records are not included in this case. The City provides no legal authority for this assertion, nor does it address the logical impossibility of requiring a requester to possess the very documents he claims a governmental entity has withheld.

If the trial court had taken this narrow position that only records noted in the 2014 privilege log were raised in this case, it would not have addressed the Attorney-Client Privilege e-mails. The Attorney-Client Privilege e-mails were mentioned only in the 2015 privilege log and were not explicitly mentioned in West's complaint, nor did West possess the 2015 privilege log from December 22, 2015 when he filed his complaint on October 5, 2015. On appeal, the City does not argue that the trial court erred in considering the Attorney-Client Privilege e-mails. Moreover, these three groups of additional documents were discussed and submitted during summary judgment, clarifying West's claims. Accordingly, we hold that, to the extent the City attempts to limit West's argument to the 2014 privilege log attached to the complaint, West's

18

complaint sufficiently provided fair notice regarding withheld documents and the adequacy of the City's search for those documents.

The City argues that these groups of records are the subject of other litigation involving West's 2015 request. The City then argues that because these documents overlap with West's other case, they cannot be at issue here. We disagree.

West's complaint and filings in this case make clear that West is arguing these groups of additional records were wrongfully withheld from his 2014 request. West argues that documents identified in the 2015 privilege log should also have been identified in the 2014 privilege log. Further, West argues that the Christopher documents and 74 pages of e-mails were responsive to his 2014 request and should have been disclosed. It may be that the Christopher documents and the 74 pages of e-mails were also withheld for West's 2015 request, or that the City improperly claimed a PRA exemption in the 2015 privilege log. However, West's arguments in this case go to these groups of records in relation to his 2014 request. Accordingly, the City's argument fails.

B.    *West's E-mail*

Next, the City argues that because West's January 31, 2017 e-mail offered to limit the issues at summary judgment, arguments made beyond those mentioned in the e-mail were improper. Further, the City argues that, because of West's proposed limitation, the City did not respond to West's arguments regarding the 74 pages of e-mails. We hold that West's e-mail did not limit his summary judgment arguments.

West, in an e-mail dated January 31, 2017 proposed noting a motion for "the 3rd" and "limiting the records at issue to the [nondisclosure agreement], and the estimates, invoices and

19

purchase order type records . . . ." CP at 712. The record does not show that the City responded

to West's e-mail. The City argues that West's e-mail suggestion of limiting his argument

somehow legally bound West regarding his future filings. The City does not cite any legal

authority to support its assertion that this e-mail limits West's actual filings with the trial court,

where he argued about and submitted evidence of these additional records. Importantly, neither

of West's proposals occurred.[12] Moreover, the City did not cite this e-mail to the trial court as a

basis for limiting West's argument, suggesting that it had not relied on West's representations.

Further, the City had the opportunity to, and did indeed respond to, West's arguments

regarding additional records. West filed his motion for partial summary judgment on January 31.

In his motion, West identified the 2015 privilege log noting the Attorney-Client Privilege e-mails

from August 27, 2014 and also stated that "many of the Email communications disclosed by the

City in December of 2015 were responsive to this request." CP at 51. West further identified

additional particular records he believed to be wrongfully withheld or redacted regarding his

2014 request. West also identified the Grant Upgrade documents that he claimed were being

silently withheld. Finally, West claimed the City silently withheld "[a] number of Email

communications responsive to the request for records" in response to his 2014 request. CP at 51.

On February 16, the City moved for summary judgment dismissal. The City's motion for

summary judgment argued that the City had provided all responsive documents to West. On

March 6, to refute the City's motion, West replied with the 74 pages of e-mails that he believed

---

[12] The summary judgment hearing did not occur on the 3rd of any month, and the arguments went beyond "the [nondisclosure agreement], and the estimates, invoices and purchase order type records." CP at 712.

were responsive to his 2014 request, yet undisclosed by the City. West's reply to the City's motion for summary judgment further argued that the City inadequately responded to his 2014 request. On March 13, 2017, the City filed a reply in support of its motion for summary judgment, addressing West's silent withholding and inadequate search arguments.

The City's argument based on West's e-mail attempting to limit the documents at issue fails.

C.      *The Trial Court Ruling on the Additional Records*

The City also argues that the trial court did not rule on the three groups of records and, as a result, these records are not at issue in this appeal. We disagree.

In evaluating an order of summary judgment, we consider only the evidence and issues called to the attention of the trial court. RAP 9.12 states, "The order granting or denying the motion for summary judgment shall designate the documents and other evidence called to the attention of the trial court before the order on summary judgment was entered."

West and the City briefed arguments regarding additional records. Orally, the trial court stated that it was not deciding West's claims regarding the 74 e-mails and the Christopher documents. However, the trial court's orders on summary judgment stated that it considered these documents and that West's "claims as to any other documents allegedly withheld are denied." CP at 631. Because the trial court's written order stated that it considered the merits of West's claims, and we review that written order on appeal, we consider the merits of West's

claims regarding the Grant Upgrade documents, Christopher documents, and 74 pages of e-mails.[13]

D.      *The Trial Court Hearing Procedure*

West argues that the trial court conducted "piecemeal" hearings in violation of CR 56. Br. of Appellant at 39. Specifically, West argues that during the June hearing, the trial court considered Travis's affidavit which addressed issues raised at a prior hearing. The case West cites to support his argument, *West v. Gregoire*, 184 Wn. App. 164, 336 P.3d 110 (2014), which addresses the procedure for PRA show cause hearings. 184 Wn. App. at 170-72. That case explains that requiring a PRA claimant to address all PRA claims during show cause proceedings promotes the orderly administration of such requests and is consistent with the PRA's purposes. *West*, 184 Wn. App. at 172. *West* is distinguishable because here, it was the trial court, not the

---

[13] After the parties completed their briefing, West filed a motion to strike a portion of the City's brief. West points to the City's argument that the 74 pages of e-mails were not reviewed by the trial court and, instead, were the subject of a separate ongoing lawsuit regarding his 2015 request. In support of his motion, West also attached a page apparently from briefing filed by the City in a subsequent lawsuit. That document states:

> [T]he 74 pages are not properly part of this lawsuit even without the issue of the overlapping appeal. In his briefing to Division II, Mr. West states that the City provided the 74 pages of emails to him in December, 2015. The instant lawsuit concerns documents that Mr. West contends had not been provided by December, 2015. The 74 pages discussed by Mr. West must necessarily be part of his first lawsuit.

Appellant's Motion to Strike, at Ex. II (Wash. Ct. App. Aug. 2, 2019). The document attached to West's motion is neither in the record on appeal, nor attested to with West's motion. West fails to provide a foundation for the document. Consequently, we do not consider it. We deny West's motion to strike.

claimant, who had questions about the existence of documents during a motion for summary judgment.

Moreover, at the June hearing, the trial court, in making its penalty determination, did not consider Travis's affidavit. Although the trial court appeared to reserve ruling regarding the Grant Upgrade documents, it subsequently orally ruled that those documents were not before it to consider. The trial court stated, "I don't think I said any other documents were wrongfully withheld" and that if it was wrong, parties could file a motion to revise. VRP (June 23, 2017) at 27. The trial court did not erroneously conduct "piecemeal" hearings.

West raised, and the trial court's written order addressed, the three groups of additional records when ruling on summary judgment. Further, the trial court followed appropriate procedure in conducting the hearings. Accordingly, we address the merits of West's arguments.

II. REDACTED INVOICES AND SPECIFIC INTELLIGENCE INFORMATION RECORDS EXEMPTION

West argues that the trial court erred when it determined that the specific intelligence information exemption applied to redactions of records at issue here. We agree because the City did not carry its burden of proof that CSS make, model, and pricing information meet the specific intelligence information exemption of RCW 42.56.240(1).

A.    *Legal Principles*

We review a trial court's order granting summary judgment de novo. *Greenhalgh v. Dep't of Corr.*, 160 Wn. App. 706, 714, 248 P.3d 150 (2011). Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

CR 56; *Greenhalgh*, 160 Wn. App. at 714.   In reviewing whether summary judgment was proper, we view all facts and reasonable inferences in a light most favorable to the nonmoving party.  *Greenhalgh*, 160 Wn. App. at 714.  Mere allegations, argumentative assertions, or conclusive statements do not raise issues of material fact sufficient to preclude a grant of summary judgment.  *Greenhalgh*, 160 Wn. App. at 714.

The PRA is a strongly worded mandate for broad disclosure of public records.  *Resident Action Council v. Seattle Hous. Auth.*, 177 Wn.2d 417, 431, 327 P.3d 600 (2013).  Its purpose is to increase governmental transparency and accountability by making public records accessible to Washington's citizens.  *John Doe A v. Wash. State Patrol*, 185 Wn.2d 363, 371, 374 P.3d 63 (2016).  We liberally construe the PRA to promote the public interest.  *Soter v. Cowles Publ'g Co.*, 162 Wn.2d 716, 731, 174 P.3d 60 (2007); RCW 42.56.030.  When evaluating a PRA claim, we must "take into account the policy of this chapter that free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials or others."  RCW 42.56.550(3).  We review agency actions under the PRA de novo.  *John Doe A*, 185 Wn.2d at 370-71; RCW 42.56.550(3).

Under RCW 42.56.070(1), a government agency must disclose public records upon request unless a specific exemption in the PRA applies or some other statute applies that exempts or prohibits disclosure of specific information or records.  *Ameriquest Mortg. Co. v. Office of the Attorney Gen.*, 177 Wn.2d 467, 485-86, 300 P.3d 799 (2013).  The agency claiming the exemption bears the burden of proving that the withheld records are within the scope of the exemption.  *Resident Action Council*, 177 Wn.2d at 428.  If an agency fails to show an element

of an exemption, disclosure is required. *See Sargent v. Seattle Police Dep't*, 179 Wn.2d 376, 390, 397, 314 P.3d 1093 (2013).

Under RCW 42.56.240(1), specific intelligence information and specific investigative records may be exempt from production. This exemption is intended to protect the integrity of law enforcement investigations. *Koenig v. Thurston County*, 175 Wn.2d 837, 843, 287 P.3d 523 (2012). To qualify for this exemption, the record must be (1) specific information that is intelligence or investigative in nature; (2) compiled by an investigative, law enforcement, or penological agency; and (3) essential to law enforcement or the protection of privacy. RCW 42.56.240(1); *Wade's Eastside Gun Shop, Inc. v. Dep't of Labor and Indus.*, 185 Wn.2d 270, 281, 372 P.3d 97 (2016).

Specific investigative records are records compiled from a specific investigation that focused on a particular party. *Koenig*, 175 Wn.2d at 843. A specific investigation is "designed to ferret out criminal activity or to shed light on some other allegation of malfeasance." *Columbian Publ'g Co. v. City of Vancouver*, 36 Wn. App. 25, 31, 671 P.2d 280 (1983). The City does not argue that the redacted documents were investigative records, and because the redacted records did not result from a particular investigation, these records cannot be specific investigative records. Thus, our first focus is on the question of whether the information is "specific intelligence information."

"Specific intelligence information" is not defined in the PRA. "[T]he term 'specific' in the exemption for specific intelligence information must be read to require not that the information concern particular individuals, but that it disclose particular methods or procedures

for gathering or evaluating intelligence information." *Haines-Marchel v. Dep't of Corr.*, 183 Wn. App. 655, 669, 334 P.3d 99 (2014).

In *King County v. Sheehan*, we held that a list of police officers' names was not specific intelligence information. 114 Wn. App. 325, 337-38, 57 P.3d 307 (2002). Because the PRA does not define the term "specific intelligence information," we looked to a dictionary definition to determine its ordinary meaning. *King County*, 114 Wn. App. at 337. We defined intelligence in this context as "'the gathering or distribution of information, especially secret information,' or 'information about an enemy' or 'the evaluated conclusions drawn from such information.'" *King County*, 114 Wn. App. at 337 (quoting RANDOM HOUSE UNABRIDGED DICTIONARY 990 (2d ed. 1993)). Further, we held that the exemption applied to *specific* intelligence information, which suggested an even narrower interpretation of the exemption. *King County*, 114 Wn. App. at 337.

We have also held that information gathered from video surveillance systems in prisons meets the specific intelligence information exemption. *Fischer v. Dep't of Corr.*, 160 Wn. App. 722, 727-28, 254 P.3d 824 (2011); *Gronquist v. Dep't of Corr.*, 177 Wn. App. 389, 400-01, 313 P.3d 416 (2013). In so holding, we "relied on the information about investigative methods that would be disclosed, such as which cameras were recording, which were dummies, when cameras were off or on, their resolution and field of view, and the extent to which they were controlled by the staff —knowledge that could help their evasion." *Haines-Marchel*, 183 Wn. App. at 667-68.

Relying on *Fischer* and *Gronquist*, we held that the Department of Correction's methods of evaluating and responding to informant prisoners are intelligence information. *Haines-*

*Marchel*, 183 Wn. App. at 668. There, the Department of Corrections claimed the specific intelligence information exemption for redacted portions of a standard two-page form. *Haines-Marchel*, 183 Wn. App. at 660. The redacted information included the identities of three informants, questions regarding the reliability of the informants, and various scaled criteria that prison officials used to evaluate informant tips and their corresponding score of reliability or authenticity. *Haines-Marchel*, 183 Wn. App. at 660-61. We held that the standard language on the form was specific intelligence information because it would disclose the Department of Corrections' evaluation techniques for informant tips and would allow prisoners "to better mask false or deceptive information." *Haines-Marchel*, 183 Wn. App. at 668, 675.

Conversely, *Jane Does 1-15 v. King County* declined to apply this rationale to university security video footage. 192 Wn. App. 10, 28, 366 P.3d 936 (2015). There, university cameras recorded an on-campus shooting. *Does*, 192 Wn. App 15. The university and the students that were depicted in the security footage argued that the specific intelligence information exemption prevented disclosure of the footage. *Does*, 192 Wn. App. at 27. Division One of this court held that the university and students failed to provide a persuasive reason as to why disclosure would harm future law enforcement efforts. *Does*, 192 Wn. App. at 27-29. This court emphasized that concealing the security system in *Fischer* was "'critical to its effectiveness *in the specific setting of a prison*.'" *Does*, 192 Wn. App. at 28 (alteration in original) (quoting *Fischer*, 160 Wn. App. at 728).

B.      *The City's Redactions Do Not Meet the Specific Intelligence Exemption*

The City redacted information regarding the make, model, and prices of the CSS equipment.  Notably, however, neither Hansen nor the City argue how the pricing information of the CSS technology is specific intelligence information.  Thus, we hold that the City fails to carry its burden regarding the pricing information redactions.  *See Sargent*, 179 Wn.2d at 397.

We next address whether CSS make and model information meets the specific intelligence information exemption.  Because the City fails the first element, we hold that this CSS make and model information does not meet this exemption.

We narrowly define intelligence information as gathering or distributing secret information, information about an enemy, or conclusions drawn from such information.  *King County*, 114 Wn. App. at 337-38.  We also defined "specific" as disclosing particular methods or procedures, or gathering or analyzing intelligence information.  *Haines-Marchel*, 183 Wn. App. at 669.

Here, make and model information in the redacted documents describes what items the City purchased or what items the City could purchase.  This information does not reveal when or how the City engages this technology.  The make and model information do not expose the investigative techniques of the City.

The City argues that the model information of a CSS, in effect, reveals the capabilities of the City because the abilities of certain CSS models are readily available.  The City argues that revealing the model allows criminals to piece together what the City possesses and how to defeat

it.  However, the make or model of a CSS device does not, in and of itself, reveal any specific intelligence information.  Hansen and FBI counsel recognized just that.

Hansen's affidavit states that disclosing an operator's manual would reveal "detailed technical information, as well as information that would tend to reveal tradecraft (how the equipment can and is used)."  CP at 157.  However, Hansen does not say that model names alone would reveal technical information or how the CSS equipment works.  The United States argued to the trial court that the specific intelligence exemption prevents the disclosure of sensitive investigative techniques and that knowing the make and model numbers of CSS devices, combined with other information that is already public, would allow criminals to circumvent law enforcement efforts.

It is the device name in conjunction with information about the CSS technology's investigative techniques that create the FBI's concern regarding disclosure.  Because some investigative techniques are in the public domain, the FBI claims that allowing individuals to connect the dots between models and the techniques would hinder effective law enforcement.  Criminals would be able to create "heat maps" of areas using CSS technology.  CP at 156.  Using a heat map to chart which law enforcement agencies possess CSS technology, criminals could tailor their activities to areas without CSS technology to better evade detection.

Although Hansen's declaration addresses the gravity of the federal government's concern, this argument goes to the third element, essential to law enforcement, rather than to the issue of whether the model redactions are specific intelligence information.  Relevant to the first

element, Hansen does not state how certain CSS technology makes or models might differ from others and why knowledge of these distinctions would be dangerous in the hands of criminals.

In its Statement of Interest, the United States pointed to an Arizona case to support the redaction of CSS information. However, Arizona's public records laws notably differ from Washington's regarding intelligence disclosure exemptions. A public officer may refuse to release or allow inspection of a public record if its disclosure "'might lead to substantial and irreparable private or public harm.'" *Hodai v. City of Tucson*, 239 Ariz. 34, 38, 365 P.3d 959 (Ct. App. 2016) (quoting *Carlson v. Pima County*, 141 Ariz. 487, 491, 687 P.2d 1242 (1984)). Unlike Washington, Arizona conducts a "best interests of the state" balancing test, considering the government's proffered reason of harm against the policy in favor of disclosure. *Hodai*, 239 Ariz. at 38-39.

The *Hodai* court reviewed a variety of law enforcement records related to CSSs. *Hodai*, 239 Ariz. at 39-40. The court considered an affidavit of an FBI agent, who stated that records explaining how the technology worked could readily thwart law enforcement investigations. *Hodai*, 239 Ariz. at 40. It held that the best interest of the state prevented disclosure of technical information about how the technology works. *Hodai*, 239 Ariz. at 40. But, the court allowed the disclosure of portions of records that explained policy rationales for the technology and the technology's use in the justice system. *Hodai*, 239 Ariz. at 40. Our case differs from *Hodai*. There, the exempted records detailed how the technology worked in its investigative capacity. Here, however, the redactions at issue are merely the names of systems or software. The redacted documents do not reveal specific information of the technology's operation.

Specific intelligence information necessarily includes secret information or conclusions drawn from intelligence, including methods, techniques, for gathering or analyzing intelligence. Make and model information alone do not meet this definition. The City relies on conclusive statements of Hansen to try to meet its burden here. Hansen's statements do not explain how the make and model information of the CSS equipment meets the PDA's *specific* intelligence information exemption, and the City has failed to meet its burden in this regard.

It should also be noted that the City seeks to keep secret the methods by which it surveils *all* its citizens. CSS is a powerful surveillance technology that can affect all who are in its proximity. CSS can allow the government to cast a wide net to gather information indiscriminately. We do not believe the legislature intended the phrase "*specific* intelligence information" to apply to such a comprehensive method of surveillance.

We hold that the City does not carry its burden of proof regarding the first element, thus, its exemption argument fails, and the redactions were improper.[14]

---

[14] West makes passing reference to numerous constitutional provisions. When an issue can be resolved on other grounds, we will avoid deciding constitutional issues. *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 291 n.7, 174 P.3d 1142 (2007). Because we decide the specific intelligence information exemption issue based on the PRA, we do not consider West's constitutional arguments.

### III. GRANT UPGRADE DOCUMENTS

West argues that there is an unresolved issue of fact regarding the Grant Upgrade documents.[15]  We agree.

West argues about a $175,000 grant the City applied for and received, presumably the Port Security Grant Upgrade, and complains that the City has not produced any documents regarding the grant application or award.  West argues that "[i]t is simply not credible to believe that the City . . . applied for and was awarded such a substantial grant without any single precursor, in the manner of Venus arising fully formed from the sea foam."  Br of Appellant at 40.  From this argument, West identifies an unresolved issue of fact regarding the third group of documents, the Port Security Grant Upgrade and the August 12, 2014, Harris Corporation quotation.  We hold that there is a question of material fact regarding the Grant Upgrade documents.

We review summary judgment decisions de novo and perform the same inquiry as the trial court.  *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013).  Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  CR 56(c).  A material fact is one upon

---

[15] West also argues that the trial court improperly considered Travis's affidavit.  But the record on review is clear that the trial court did not consider Travis's affidavit.  The court clearly stated, "I didn't read [Travis's affidavit] to begin with and I haven't considered it in conjunction with what we've done here today."  VRP (June 23, 2017) at 31.  Additionally, the trial court's order resulting from the June hearing stated that it considered the City's motion on penalties, but not that it considered the attachment to that motion.  The only attachment was Travis's affidavit.

which the outcome of the litigation depends. *In re Estate of Black*, 153 Wn.2d 152, 160, 102 P.3d 796 (2004).

Here, the trial court at the May hearing requested more information regarding the Grant Upgrade documents and the City's production of them to West. The issue was whether the documents were in existence and in the possession of the City at the time of West's request. The City provided briefing on the issue with Travis's affidavit attached. Travis's affidavit did not resolve questions of the City's production of these documents to West. Later at the June hearing, the trial court made clear that it did not and would not rule on the documents, and did not consider Travis's affidavit.

An issue of material fact remains regarding this third group of documents. The 2015 privilege log lists the 2014 Port Security Grant Upgrade and the August 12, 2014 Harris Corporation quotation. West argued that the City possessed these documents at the time of his 2014 request. The City, through Travis, stated that it was unsure of the dates it came into possession of these documents. The trial court did not determine whether the City possessed these documents at the time of West's 2014 request. Further, if the City possessed the documents, the trial court did not determine whether these documents would have been responsive to his 2014 request. We remand the issue to the trial court for a factual determination regarding the Grant Upgrade documents.

IV. THE CHRISTOPHER DOCUMENTS AND 74 PAGES OF E-MAILS

West next argues that the Christopher documents and 74 pages of e-mails were responsive to his request and required disclosure.[16] In other words, West argues that the City did not complete an adequate search for his 2014 request because an adequate search would have uncovered the Christopher documents and the 74 pages of e-mails.[17] We hold that the City has not shown that its search for these records was adequate beyond a material doubt.

A.      *Adequate Search Legal Principles*

The failure to adequately search for responsive documents is a violation of the PRA. *Neighborhood All. v. County of Spokane*, 172 Wn.2d 702, 721, 724, 261 P.3d 119 (2011). A search for records pursuant to a PRA request must be "reasonably calculated to uncover all relevant documents." *Neighborhood All.*, 172 Wn.2d at 720. Reasonableness is dependent on the facts of each case. *Neighborhood All.*, 172 Wn.2d at 720. An agency must search more than one place if there are additional sources for requested information. *Neighborhood All.*, 172 Wn.2d at 720. However, an agency need not "search *every* possible place a record may conceivably be stored, but only those places where it is *reasonably likely* to be found."

---

[16] Although West requests relief related to the Grant Upgrade documents, West does not substantively argue about the search for these documents.

[17] The City argues that the trial court already determined that the City violated the PRA, and, as a result, the adequacy of the City's search is not at issue on appeal. However, West is not arguing that the trial court did not adequately search regarding the Attorney-Client Privilege e-mails. Rather, West's adequate search argument is based on the 74 pages of e-mails and the Christopher documents. Because we hold that the trial court should have considered these additional groups of records, we consider whether the City adequately searched for the 74 pages of e-mails and the Christopher documents.

*Neighborhood All.*, 172 Wn.2d at 720 (alteration in original). Further, the mere fact that a record is eventually found does not itself establish the inadequacy of an agency's search. *Kozol v. Dep't of Corr.*, 192 Wn. App. 1, 8, 366 P.3d 933 (2015).

We conduct a fact-specific inquiry to determine if a search is reasonable. *Neighborhood All.*, 172 Wn.2d at 720. We review the scope of the agency's search as a whole and whether that search was reasonable, not whether the requester has presented alternatives that he believes would have more accurately produced the records he requested. *Hobbs v. State*, 183 Wn. App. 925, 944, 335 P.3d 1004 (2014). The issue of whether a search was reasonably calculated, and therefore adequate, is separate and apart from whether additional responsive documents exist but are not found. *Neighborhood All.*, 172 Wn.2d at 720. An agency does not have a duty under the PRA to produce records that do not exist at the time of the public records request. *Zink v. City of Mesa*, 162 Wn. App. 688, 718, 256 P.3d 384 (2011).

The PRA requires an adequate search to properly disclose responsive documents. *Neighborhood All.*, 172 Wn.2d at 721. The lack of an adequate search prevents adequate response and production. *Neighborhood All.*, 172 Wn.2d at 721. Accordingly, because the PRA considers the failure to properly respond as a violation, the failure to adequately search is also considered a violation. *Neighborhood All.*, 172 Wn.2d at 721, 724.

On a motion for summary judgment, an agency bears the burden of showing its search was adequate beyond material doubt. *Neighborhood All.*, 172 Wn.2d at 720-21. To prove that its search was adequate, the agency may rely on reasonably detailed, nonconclusory affidavits from its employees submitted in good faith. *Neighborhood All.*, 172 Wn.2d at 721. The

affidavits "should include the search terms and the type of search performed, and they should establish that all places likely to contain responsive materials were searched." *Neighborhood All.*, 172 Wn.2d at 721.

B.      *The City Did Not Adequately Search for the Christopher Documents or 71 Pages of the 74 Pages of E-mails*

West identified six pages of the Christopher documents and 74 pages of e-mails that he believes should have been disclosed because they contained communications concerning TPD's public response regarding CSS technology. West argues that these e-mails, similar to the improperly withheld Attorney-Client Privilege e-mails, should have been disclosed because a reasonable search would have revealed the documents, and the documents were within the scope of his request. He argues that the trial court's conclusion that the City should have disclosed one group of records but not the other is internally inconsistent, thus, in error. We hold that the City's search was not adequate beyond a material doubt.

A public record includes "any writing containing information relating to the conduct of government." Former RCW 42.56.010(3) (2010). Writing includes "handwriting, typewriting, printing, photostating, photographing, and every other means of recording any form of communication or representation including, but not limited to, letters [and] words . . . ." Former RCW 42.56.010(4).

West requested, "Any records concerning any agreements, policies, procedures, or understandings related to the acquisition, use, or operation of stingray technology." CP at 9. The issue is whether Smith conducted an adequate search for West's 2014 request when he did not search for e-mail communications related to TPD public responses regarding CSSs.

Smith stated that he "interpreted [West's 2014] request as seeking documents specifically related to the acquisition, use, and operation of the equipment, and that is what [Smith] provided to him." CP at 880. Smith stated that he "did not interpret [West's 2014] request as seeking the emails [the City] provided to him the following year, in response to [West's 2015] request." CP at 781. Smith stated that the e-mails disclosed in 2015 related to the City's response to a newspaper article about CSS technology and how the City's response needed to comply with its nondisclosure agreement. Smith believed that West's 2014 request only sought records "concerning the acquisition, use, and operation of [CSS] technology." CP at 781. He stated that "[b]ecause our internal discussion about the newspaper article did not concern the acquisition, use, and operation of the equipment, I did not view the emails as responsive and did not produce them." CP at 781.

The City's search was not adequate beyond a material doubt. Smith's belief that asking for a "record" instead of a "communication" prevented an adequate search of City e-mails. A record is any writing, and any writing includes e-mail communications. Former RCW 42.56.010(3)-(4) (2010). A request for "records" necessarily includes e-mails. Further, Smith's interpretation of West's 2014 request was that it did not include the City's coordinated responses to reporters seeking CSS information because West only requested records about the "acquisition, use, or operation" of CSS technology. However, Smith's interpretation of West's 2014 request was narrower than its language. West requested records "concerning any agreements, policies, procedures, or understandings related to the acquisition, use, or operation of stingray technology." CP at 9. Because Smith's failure to conduct an e-mail search in

response to West's 2014 request and because Smith restricted West's 2014 request to less than its actual wording, we hold that the City's search was not adequate beyond a material doubt.

The Christopher documents are a single thread of e-mails drafting responses to a reporter's written questions. These records should have been searched for and disclosed because they relate to the City's policies, procedures, and understandings regarding CSS technology and what information the public can know. The Christopher documents were within the scope of West's 2014 request.

Similarly 71 pages of the 74 pages of e-mails should also have been disclosed because they address the same issues. The 71 pages of e-mails generated before West's 2014 request include (1) responses to and internal discussions about responding to a Tacoma News Tribune reporter's and other news agencies' questions; (2) formulating a press release regarding the City's CSS technology; (3) communications between TPD employees and City officials and councilmembers regarding disclosure of CSS technology's function, capability, and sources of funding; (4) internal TPD discussions regarding what documents the City can and cannot disclose because of its nondisclosure agreement with the FBI. These 71 pages of e-mails were within the scope of West's 2014 request. However, the four pages of e-mails generated after West's 2014 request cannot be responsive. *Zink*, 162 Wn. App. at 718.[18]

---

[18] Regarding the Attorney-Client Privilege e-mails, we note that the trial court disagreed with Smith's interpretation and search, ruling that the e-mail communications should have been disclosed because these communications were within the scope of West's 2014 request and would have been discovered with an adequate search. The City did not appeal this ruling. It would be incongruous to rule that Smith's search should have uncovered the Attorney-Client Privilege e-mails but not the Christopher documents or 74 pages of e-mails.

C.      *Error Not Harmless*

The City argues that if the Christopher documents and the 74 pages of e-mails are properly part of this case, any error was harmless because the trial court considered the Attorney-Client Privilege e-mails as a single record.  We disagree.

When an error is committed, unless there is reasonable probability that the error changed the outcome of the proceeding or prejudiced a party, the error is harmless.  *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 452, 191 P.3d 879 (2008).  For PRA penalty determinations, trial courts have discretion to group records together or separate them.  *Zink*, 162 Wn. App. at 712.

The City argues that any error was harmless because the trial court would have considered all the e-mails as one record, thus the penalty would not change.  However, there is a reasonable probability that including the additional groups of records would have changed the outcome of the proceeding.  Trial courts have *discretion* to group records together or separate them for penalty purposes.  *Zink*, 162 Wn. App. at 712.  We will not make the determination that these records would have been considered a single record.  There is a reasonable probability that the trial court would have treated the records differently at the penalty phase.  Accordingly, we reject the City's harmless error argument.

## V.  PRA PENALTY

West argues that the trial court erred when calculating the number of days the City withheld the Attorney-Client Privilege e-mails and that the trial court abused its discretion when weighing PRA penalty factors and awarding him a $10 per day penalty.  Because we reverse the

trial court and hold that the City's search violated the PRA, we remand to the trial court for a new PRA penalty determination.

## VI. CONCLUSION

We hold that (1) the Christopher documents, the 74 pages of e-mails, and Grant Upgrade documents are properly in issue, (2) the trial court did not improperly bifurcate the summary judgment hearing, (3) the City's redactions do not meet the specific intelligence information exemption, (4) the trial court erred by granting the City's motion for summary judgment when a material issue of fact existed regarding the Grant Upgrade documents, and (5) the City did not conduct an adequate search for responsive records. Finally, we vacate the trial court's order purporting to dismiss this case. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

Worswick, J.

Cruser, J.

LEE, A.C.J. (dissenting in part) — I agree with the majority in all respects except for its holding that the City's redactions do not meet the specific intelligence information exception. On that issue, I respectfully dissent. Instead, I would hold that, given the landscape of publicly available information, disclosure of the specific cell-site simulator (CSS) make and model purchased by the City and the Tacoma Police Department (TPD) falls within the specific intelligence information exemption.[19]

The majority reasons that the CSS make and model information is not specific intelligence information because disclosure of the CSS make and model alone does not disclose any intelligence information. Majority at 28-30. I respectfully disagree. Because disclosure of the specific CSS make and model necessarily discloses the type of technology employed by TPD, including its capabilities and limitations, I would hold that the CSS make and model is specific intelligence information. And because disclosure of the CSS make and model employed by TPD would provide criminals with the means to thwart law enforcement efforts, I would hold nondisclosure is essential to effective law enforcement.[20]

RCW 42.56.240(1) states that the following information is exempt from public disclosure:

Specific intelligence information and specific investigative records compiled by investigative, law enforcement, and penology agencies and state agencies vested with the responsibility to discipline members of any profession, the nondisclosure of which is essential to effective law enforcement or for the protection of any person's right to privacy.

---

[19] However, I agree with the majority that the City failed to meet its burden to demonstrate that disclosure of CSS pricing information is exempt as specific intelligence information.

[20] Neither party disputes that the records were compiled by an investigative, law enforcement, or penological agency; therefore, the second prong of RCW 42.56.240(1) is not at issue.

The court in *King County v. Sheehan* held that "'intelligence' may be defined as 'the gathering or distribution of information, especially secret information,' or 'information about an enemy' or 'the evaluated conclusions drawn from such information.'" 114 Wn. App. 325. 337, 57 P.3d 307 (2002) (quoting RANDOM HOUSE UNABRIDGED DICTIONARY 990 (2d ed. 1993)). However, as we recognized in *Haines-Marchel v. Dep't. of Corr.*, 183 Wn. App. 655, 667, 334 P.3d 99 (2014), the definition provided in *Sheehan* does not address situations in which the information at issue is about *how* law enforcement agencies carry out their investigations.

Instead, that issue is addressed in a separate line of cases, including *Haines-Marchel*, *Fischer v. Dep't. of Corr.*, 160 Wn. App. 722, 727-28, 254 P.3d 824, *review denied*, 172 Wn.2d 1001 (2011), and *Gronquist v. Dep't. of Corr.*, 177 Wn. App. 389, 400-01, 313 P.3d 416 (2013), *review denied*, 180 Wn.2d 1004 (2014). When information discloses information about *how* investigations are conducted, we look at what information can be learned from the disclosure, not the content of the disclosure itself. *See Haines-Marchel*, 183 Wn. App. at 667-68 (specific intelligence information includes particular methods or procedures for gathering or evaluating intelligence information).

For example, *Fischer* and *Gronquist*, both held that prison surveillance tapes were exempt from disclosure because the disclosure of prison surveillance videos could disclose information about what cameras were recordings, which cameras were monitored, which cameras were dummies, and which cameras had specific resolutions or fields of view. 160 Wn. App. at 726; 177 Wn. App. at 399-400. And in *Haines-Marchel*, preprinted information on informant forms would

disclose the Department of Corrections methods of evaluating and responding to tips from informants. 183 Wn. App. at 668.

Similarly, here, disclosure of the specific CSS make and model discloses the type of equipment TPD has access to and, therefore, the capabilities and limitations of TPD's CSS technology used in investigations. FBI Supervisory Special Agent Russell Hansen stated in his affidavit that disclosure of CSS product or software names would reveal, based on the accumulation of information, the use and technical capabilities of the technology, which would allow the evasion of law enforcement efforts. Specifically, Hansen stated that disclosure of the specific CSS make and model would reveal TPD's CSS capabilities and weaknesses because that information, *along with other information already available*, would allow anyone to piece together "heat maps" of areas where the specific CSS technology is operated. CP at 156. And the information in the operator's manual would reveal "detailed technical information, as well as information that would tend to reveal tradecraft (how the equipment can and is used)." CP at 157.

Thus, given the presence of other publicly available information, disclosure of the particular CSS make and model employed by TPD necessarily discloses specific intelligence information about how TPD can conduct certain types of investigations in the same way that disclosure of a prison surveillance video discloses information about how prisons monitor inmates. *See Fischer*, 160 Wn. App. at 726; *Gronquist*, 177 Wn. App. at 399-400. Therefore, I would hold that the specific CSS make and model is specific intelligence information and nondisclosure is essential to effective law enforcement.

Accordingly, I would affirm the trial court's order granting summary judgment on the issue of whether the CSS make and model are exempt as specific intelligence information.

_____
Lee, A.C.J.