IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| C.S.A., a minor, by and through his guardians B.W.A. and P.E.S., | No. 85728-2-I |
| Appellants, | |
| v. | PUBLISHED OPINION |
| BELLEVUE SCHOOL DISTRICT NO. 405, | |
| Respondent. | |

BOWMAN, J. — C.S.A. appeals the dismissal of his lawsuit, alleging the Bellevue School District (District) violated the Public Records Act (PRA), chapter 42.56 RCW, by failing to respond diligently to three of his requests for surveillance videos. The District contends the videos are exempt from production as education records under the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g. Because the District fails to show the videos are exempt and did not diligently respond to C.S.A.'s requests, we reverse and remand for the trial court to determine appropriate penalties, costs, and fees.

FACTS

On the morning of November 19, 2021, students at Newport High School orchestrated a walkout to protest the District's handling of complaints about relationship abuse. The students who organized the protest included A.S., C.S.A.'s ex-girlfriend, who accused him of relationship violence. During the

protest, organizers directed hundreds of students outside and used megaphones to lead chants. They also named alleged abusers, including C.S.A. After about an hour, the protest moved inside the school. Once inside, the protesters "quickly took position" on the "senior steps," a common area in the school, and protest organizers used megaphones "to instigate the crowd" with more chants. Soon after, Bellevue police arrived, and the crowds dispersed.

When the protest began, C.S.A. was in his choir class. At the end of that class, C.S.A. tried to walk to English. But he was greeted by "a swarm of . . . kids" who pointed at him, and one yelled, " 'That's him; that's him.' " According to C.S.A.'s father, "[C.S.A.] was accosted by students who threatened, shoved, and pushed him," which made C.S.A. "scared and anguished."

After A.S. accused C.S.A. during the protest, other students harassed C.S.A. throughout the school year. On March 28, 2022, another student, O.P., saw C.S.A. in the school parking lot, screamed that he was a " 'woman beater,' " and threatened to " 'beat the shit out of [him].' " C.S.A. filed a harassment, intimidation, and bullying (HIB) complaint about the incident with the school. And on April 25, 2022, three other students confronted C.S.A. near the school office. C.S.A. filed another HIB complaint about that incident.

1. PRA Request for November 19, 2021 Protest Videos

On December 14, 2021, C.S.A. sent a letter to the District superintendent, in part asking that the District "[p]reserve and produce any and all videos, photographs, and or records pertaining to the November 19 riot, unredacted and

2

unedited."[1] Then, on December 20, 2021, C.S.A. emailed the District's public records office, requesting "all video / photographic evidence of the Riot and related events, including but not limited to footage of both the outside events and the inside events."[2]

That same day, a public records officer for the District responded, asking C.S.A to "clarify whether [he was] making these requests of the District on the basis of the [PRA]." C.S.A. responded, "These documents are being requested of the Bellevue School District. Produce them." The District again asked about the basis for the request. C.S.A. did not respond. So, the next day, the District acknowledged receipt of C.S.A.'s request for public records and started processing the request under the PRA. It told C.S.A. that it would respond "in a series of installments" and estimated that it would produce the first records by February 1, 2022.

On December 30, 2021, the District emailed C.S.A. a letter, stating that "[m]any of the items [he] requested would NOT be disclosable" under the PRA. But the District explained that because C.S.A. feared for his safety at school based on the November 19 events, under District policy 3231 and procedure 3231P, C.S.A. was "entitled to a release of records that he would not otherwise

---

[1] He also noted that "a separate request for records is forthcoming," and asked the District to "preserve any and all documents and records pertaining in any way to . . . identified harassers of [C.S.A.]; the November 19 riot; and police documents and records pertaining to [A.S.] and/or [C.S.A.]."

[2] He also requested information about a disciplinary hearing involving A.S. and "all other records pertaining to the [November 19] Riot," including social media posts, correspondence, investigation documents, and notes by staff. Those documents are not at issue in this appeal.

be entitled to, using only a public-records rubric."[3]  So, the District determined that it would provide C.S.A. "additional materials under the basis of Procedure 3231P."

The District then told C.S.A. that there were "several camera views that captured the gathering of students, both outside and inside," during the protest, and that it would make the footage available for viewing under the parameters of a 2017 United States Department of Education (DOE) advisory, "Letter to Wachter."  *See* Letter from Michael B. Hawes, Dir. of Student Priv. Pol'y, U.S. Dep't of Educ., to Timothy S. Wachter, Knox McLaughlin Gornall & Sennett PC (Dec. 7, 2017), https://studentprivacy.ed.gov/sites/default/files/resource_ document/file/Letter%20to%20Wachter%20%28Surveillance%20Video%20of%2 0Multiple%20Students%29_0.pdf [https://perma.cc/CZ9T-JGEM].[4]  The District explained that C.S.A. "is entitled to inspect and review documents" related to the November 19 incident at the District headquarters but that the District "will not be providing copies" because they "depict clearly-identifiable students" unrelated to the protest organizers and are "impractical if not impossible" to redact.[5]

---

[3] District procedure 3231P(e) provides, in relevant part:
Information may be released to appropriate persons and agencies in connection with an emergency to protect the health or safety of the student or other persons.  The [D]istrict will take into account the totality of the circumstance and determine if there is an articulable and significant threat to the health or safety of the student.

[4] Letter to Wachter is a DOE interpretation of a Pennsylvania school district's obligations related to inspecting and reviewing videos that amount to "education records" under FERPA.

[5] The District also told C.S.A. that "there are no known still photos" of the protest.

C.S.A. viewed the videos at the District office in January 2022.[6]  After viewing the videos, C.S.A. told the District on January 27 that he also needed video from the day of the protest showing the hallways between the school's choir and English classrooms between 10:45 and 10:52 a.m., and the hallways between the English classroom and the front office between 10:53 and 11:00 a.m.  The District did not respond to C.S.A.'s request for the additional hallway videos.

In August 2022, the District hired a new public records officer.  "Within [her] first few months at [the District]," she obtained training on video redaction.  The District also obtained new software able to redact video footage.  Four months later on December 13, 2022, the District produced to C.S.A. videos from November 19, 2021 with redactions of all identifiable students.  The videos showed the protest both inside and outside the school but they did not show the hallways during the protest.[7]

2.  PRA Request for March 28, 2022 HIB Videos

On March 29 and 30, 2022, C.S.A. submitted PRA requests for school surveillance videos of the March 28, 2022 parking lot HIB incident.  The District acknowledged receipt of the PRA requests on April 4, 2022.  Two days later, C.S.A. specified that his request included interior and exterior videos.  The District acknowledged receipt of the updated request on April 8, 2022.

---

[6] It appears the District provided videos of the senior stairs and office but they "would not load."  The District later told C.S.A. that "we are working on that."

[7] And according to C.S.A., the exterior videos were so redacted that "the blurring made them completely useless."

Over the following days, a District public records officer and C.S.A. exchanged emails to try to clarify the request. Ultimately, on April 15, 2022, C.S.A. sent the District a letter, identifying 17 categories of requests, including documents related to "[t]he March 28, 2022 HIB complaint." On May 2, 2022, the District notified C.S.A. that it would respond to his records request on an installment basis, with the first installment by May 13, 2022. In its message, the District explained that some of the records C.S.A. sought are likely protected under FERPA.

The District produced records relevant to C.S.A.'s requests on May 17, June 13, July 20, August 15, and September 7, 2022.[8] But none of those installments included the March 28 videos. Instead, the District twice extended its estimated production deadlines. Once because it "experienced extended [I]nternet access interruptions that have affected . . . public records processing," and once "[d]ue to high workload in this department and anticipated staff absences."

On September 15, 2022, C.S.A.'s attorney requested a "pause" of installments due to "personal matters and unavailability." On December 5, 2022, C.S.A. requested that production resume. The District then produced an eighth installment on December 13, 2022, which included the November 19 videos but not the March 28 videos.

_____

[8] In preparation for a trial by affidavit, the parties submitted to the trial court stipulated facts underlying C.S.A.'s request for the March 28, 2022 videos. Those facts show only the May 17 and June 13 productions. The District then attached a declaration to a simultaneously filed motion for judgment as a matter of law that identified the July 20, August 15, and September 7 installments. Because C.S.A. does not dispute the additional installments, we include all installment dates here.

The District produced no records after December 2022.[9]  Then, on May 19, 2023, the District produced to C.S.A. four videos from March 28 related to the parking lot HIB incident—two redacted and two unredacted.[10]  The District explained that the redactions were made "to protect students' identifying characteristics" and exempt under RCW 42.56.070(1)[11] and 20 U.S.C. § 1232g(a)(4)(A).

3.  PRA Request for April 25, 2022 HIB Videos

On May 19, 2022, C.S.A. made a public records request to the District, seeking "any and all documents related to the April 25, 2022 HIB incident" when three students confronted him by the school office, including video footage.  Four days later, the District acknowledged receipt of the request, asked for clarification about what records C.S.A wanted, and said that it would respond in a series of installments with the first documents provided on June 28, 2022.  On May 30, 2022, C.S.A. explained that he sought any video footage related to the incident from inside and outside the school.  The District asked what C.S.A. meant by "the incident."  On June 30, C.S.A. wrote to the District that the "incident" referred to his report of harassment on April 25, 2022.  The District accepted that clarification.

---

[9] The District later explained that "[d]uring this time, [it] received an unprecedented number of public records requests and was short staffed," and that it "worked as diligently as possible to respond to the many requests, including the several requests from [C.S.A.]."  But the record does not show that the District conveyed that information to C.S.A. at the time.

[10] The District also provided an exemption log.

[11] RCW 42.56.070(1) exempts production of records protected from production by "other statute[s]."

On July 29, 2022, the District disclosed to C.S.A. the existence of three videos that were part of its investigation file related to the April 25, 2022 HIB incident.  But the District explained that the videos show personally identifying features of students and claimed that they were exempt from production under RCW 42.56.230(1),[12] .070(1), and FERPA.  It said that C.S.A. could inspect and view the videos but that it could not provide copies under the PRA.  C.S.A. objected to that determination, but the District did not produce copies of the videos.

4.  Procedural History

On June 14, 2022, C.S.A. sued the District, alleging that it violated the PRA by failing to diligently respond to his requests for school surveillance videos.[13]  On February 24, 2023, C.S.A moved for a show cause order on his request for videos depicting the November 19, 2021 protest.  He argued that the District violated the PRA by withholding relevant videos for over a year without asserting a valid exemption.[14]  He asked for an order finding the District violated

---

[12] RCW 42.56.230(1) exempts from disclosure personal information in "any files maintained for students."

[13] C.S.A. amended his complaint on June 19, 2022 and September 2, 2022.  He made several other allegations in his second amended complaint, including violations of chapters 28A.155, .640, and .642 RCW.  Only the PRA-related allegations are at issue in this appeal.

[14] C.S.A. also contended that he requested video of another "male student being chased" down a hallway "and confronted" by protesters on November 19, and that the District failed altogether to produce that video to him.  But the only request for such a video that appears in the record was made by C.S.A. in a February 19, 2023 email, 15 months after the protest occurred.

the PRA by withholding the videos and directing the District to produce them. C.S.A. also asked the court to impose penalties, costs, and fees.[15]

The District opposed C.S.A.'s motion. It first argued that because C.S.A. asked the court to find liability and damages, he was seeking summary judgment rather than a show cause finding. The District then argued that C.S.A. "failed to establish as a matter of law that [it] violated the PRA," and, instead, "the actual facts and evidence establish that [the District] wholly complied with the PRA." The District argued it "properly and timely responded with a 5-day letter, and thereafter properly identified that the videos are exempt from disclosure pursuant to FERPA and the 'other statute' exemption" of the PRA. In a declaration accompanying its motion, a District public records officer explained that the redacted videos it produced were the only videos available from November 19, 2021 because it retains school security footage for only 30 days. And C.S.A. asked for the hallway videos after the 30-day preservation period expired. C.S.A. replied that FERPA does not exempt the records from production under the PRA.

The trial court heard argument on C.S.A.'s show cause motion. On March 27, 2023, it entered an order denying the motion. The court held that the District complied with the PRA. It noted that while a "portion" of C.S.A.'s motion "styles itself as a motion to show cause under the [PRA]," it is "actually a motion for summary judgment on one of [his] PRA claims related to the production of video

---

[15] C.S.A. also asked the court to strike the District's answer to his complaint as a sanction for violating discovery requests. And C.S.A. asked the court to dismiss on summary judgment four of the District's affirmative defenses, arguing that no facts support the asserted defenses. The court's ruling on the discovery sanction is not at issue on appeal. And the parties represent that C.S.A. withdrew the summary judgment motion related to the District's affirmative defenses.

footage of events at the school" during the November 19 protest. Then, analyzing the motion related to the PRA as a motion for summary judgment, the court found that C.S.A.'s requests for video records of the protest "did not include the areas which [C.S.A.] subsequently requested."

C.S.A. moved for reconsideration. He argued that the court erroneously shifted the burden of proof from the District to him when it ruled on his motion to show cause as a motion for summary judgment. He also argued that the court failed to address the District's "15-month delay in producing the other 50 videos" that the District acknowledged existed.

On May 11, 2023, the court granted C.S.A.'s motion to reconsider. As for C.S.A.'s claim that it applied the wrong standard, the court again noted that "the nature of the motion and the remedy requested" support finding that C.S.A. sought summary judgment, not a motion to show cause. But it concluded that even under the show cause standard, the record establishes that the District's responses to C.S.A.'s public records requests complied with "both the spirit and the letter of the [PRA]." As for the late disclosure of the existing videos, the court again found that the District "complied with the letter and spirit of the [PRA] having provided timely responses to [C.S.A.]'s requests, raising a legitimate issue under [FERPA]." It denied C.S.A.'s motion to show cause "due to the 'late' disclosure."

The parties then turned to C.S.A.'s requests for the March 28 and April 25 videos. They agreed to resolve the disputes over those records through a trial by affidavit and stipulated to facts and a briefing schedule.

In his brief, C.S.A. argued that the District failed to meet its burden of showing that the videos he sought were exempt from disclosure under FERPA and thus failed to justify its delay in producing videos from March 28 or April 25 in violation of the PRA.[16]  The District argued that it properly produced the March 28 videos, properly disclosed the April 25 videos, and properly asserted that the disputed videos are exempt from unredacted production under FERPA and therefore exempt as an "other statue" under the PRA.

On July 31, 2023, the court entered its "Order on Trial by Affidavit Re Plaintiff's PRA Claims."  The trial court concluded that the District complied with the PRA and dismissed with prejudice C.S.A.'s PRA claims against the District.

C.S.A. appeals.

ANALYSIS

C.S.A. argues that the trial court erred by denying his motion to show cause why the District violated the PRA in its responses to his requests for videos from the November 19, 2021 protest.  He also argues the trial court erred by ruling that the District complied the PRA when it withheld from production videos of the March 28, 2022 and April 25, 2022 HIB incidents.  The District argues it properly withheld production of the videos under FERPA and the "other statue" exemption of the PRA.  We agree with C.S.A.

We review de novo an order on a motion to show cause when, as here, the record "consists entirely of written materials and the trial court has not seen

---

[16] C.S.A. simultaneously moved to compel disclosure of the videos in compliance with the rules of discovery, which the trial court denied.  The court's ruling on that discovery issue is not before us in this appeal.

nor heard testimony requiring it to assess the credibility or competency of a witness, weigh evidence, or reconcile conflicting evidence." *Gronquist v. Dep't of Corr.*, 159 Wn. App. 576, 590, 247 P.3d 436 (2011). We also review de novo a trial court's PRA determination "where the record consists only of affidavits, memoranda of law, and other documentary evidence" because we "stand[ ] in the same position as the trial court." *Progressive Animal Welfare Soc'y v. Univ. of Wash.* (*PAWS*), 125 Wn.2d 243, 252, 884 P.2d 592 (1994).

1.  The PRA

The PRA is a strongly worded mandate for broad disclosure of public records. *West v. City of Tacoma*, 12 Wn. App. 2d 45, 70, 456 P.3d 894 (2020). It "requires all state and local agencies to disclose any public record upon request, unless the record falls within certain very specific exemptions." *PAWS*, 125 Wn.2d at 250. The purpose of the PRA is to increase governmental transparency and accountability by making public records accessible to Washington's citizens. *West*, 12 Wn. App. 2d at 70. Accordingly, we liberally construe the PRA to promote the public interest in free and open examination of public records. *Id.*; RCW 42.56.030, .550(3).

There is no official format for a valid PRA request. *Cantu v. Yakima Sch. Dist. No. 7*, 23 Wn. App. 2d 57, 81-82, 514 P.3d 661 (2022). And a party need not specifically cite the act to make a request under the PRA. *Wood v. Lowe*, 102 Wn. App. 872, 878, 10 P.3d 494 (2000). But a party seeking documents must, at a minimum, provide notice that their request is made under the PRA and identify the documents with reasonable clarity to allow the agency to locate them.

*Cantu*, 23 Wn. App. 2d at 81-82. Once a person requests identifiable public records, an agency must make them "promptly available."[17] RCW 42.56.080(2). And an agency must provide "the fullest assistance to inquirers and the most timely possible action on requests for information." RCW 42.56.100.

When an agency receives a records request, it must respond within five business days by (1) providing the records, (2) providing an Internet link to the records requested, (3) providing a reasonable estimate of the time it will take to respond, (4) asking for clarification along with an estimated time to respond, or (5) denying the request. RCW 42.56.520(1). An agency may produce records in installments but must make them with reasonable diligence. RCW 42.56.080(2); *see Cantu*, 23 Wn. App. 2d at 90.

Despite the PRA's presumption of openness and transparency, the legislature has made certain public records exempt from production. *Doe ex rel. Roe v. Wash. State Patrol*, 185 Wn.2d 363, 371, 374 P.3d 63 (2016). We narrowly construe such exemptions "to assure that the public interest will be fully protected." RCW 42.56.030. If an agency determines that a record is exempt from production, it must provide a written statement of the specific reasons for the denial. RCW 42.56.520(4). And the agency claiming the exemption bears the burden of proving that the withheld records fall under the exemption. *West*, 12 Wn. App. 2d at 70.

---

[17] Under the PRA, "[r]ecords are either 'disclosed' or 'not disclosed.' " *Sanders v. State*, 169 Wn.2d 827, 836, 240 P.3d 120 (2010). "A record is disclosed if its existence is revealed to the requester in response to a PRA request, regardless of whether it is produced." *Id.* Disclosed records are then "either 'produced' (made available for inspection and copying) or 'withheld' (not produced)." *Id.* Under the PRA, a document is "never exempt from disclosure; it can be exempt only from production." *Id.*

The PRA provides a cause of action for two types of violations of the act: (1) when an agency's estimated time to respond to a request is unreasonable or (2) when an agency wrongfully denies an opportunity to inspect or copy a public record. *Andrews v. Wash. State Patrol*, 183 Wn. App. 644, 651, 334 P.3d 94 (2014) (citing RCW 42.56.550(1), (2)). Failure to diligently respond to a request is unreasonable and amounts to a PRA violation. *Cantu*, 23 Wn. App. 2d at 88, 94. If the requester prevails in showing a violation, the PRA provides an award of "all costs, including reasonable attorney fees." RCW 42.56.550(4). It also gives courts the discretion to "award such person an amount not to exceed [$100] for each day that he or she was denied the right to inspect or copy said public record." *Id.*

2. FERPA under the PRA's "Other Statute" Exemption

The PRA exempts from production records protected under "other statute[s]." RCW 42.56.070(1). To satisfy the "other statute" exemption under the PRA, the agency must explicitly identify a specific record, or its portions, as "exempt or otherwise prohibited from production [by another statute] in response to a public records request." *Doe ex rel. Roe*, 185 Wn.2d at 373. That is, the "other statute" exemption " 'applies only to those exemptions explicitly identified in other statutes.' " *Id.* at 372 (quoting *PAWS*, 125 Wn.2d at 262). So, we cannot imply exemptions. *Id.* Withholding or redacting a nonexempt document violates the PRA. *Cantu*, 23 Wn. App. 2d at 100.

14

FERPA falls under the PRA's "other statute" exemption if it expressly exempts the relevant records from disclosure. *Baxter v. W. Wash. Univ.*, 20 Wn. App. 2d 646, 663, 501 P.3d 581 (2021).[18]  FERPA is a federal statute designed to ensure access to "education records" for students and parents while protecting the privacy of those records from the public at large.  20 U.S.C. § 1232g; *West v. TESC Bd. of Trs.*, 3 Wn. App. 2d 112, 120, 414 P.3d 614 (2018); *Student Press Law Ctr. v. Alexander*, 778 F. Supp. 1227, 1228 (D.C. 1991).

Accordingly, FERPA affords parents the right to inspect and review the education records of their children.  20 U.S.C. § 1232g(a); 34 C.F.R. § 99.10.

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children.

20 U.S.C. § 1232g(a)(1)(A).  At the same time, FERPA " 'restricts school disclosure of students' education records and personally identifiable information' " without consent from the parent or eligible student.[19]  *Baxter,* 20 Wn. App. 2d at 663 (quoting *West*, 3 Wn. App. 2d at 115).  Under FERPA:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally

---

[18] Citing *Lindeman v. Kelso School District No. 458*, 162 Wn.2d 196, 172 P.3d 329 (2007), C.S.A. argues generally that "the PRA does not exempt school surveillance videos."  But *Lindeman* addressed a request under the PRA's "student file" exemption. *Id.* at 201.  In this appeal, the District seeks exemption under FERPA through the PRA's "other statute" exemption.  So, *Linderman* is inapt.

[19] FERPA operates by conditioning a school's federal education funding on compliance with its mandate.  *Baxter*, 20 Wn. App. at 663.  The parties do not dispute that the District has received federal funds, so it has assumed the obligation of complying with FERPA's disclosure restrictions.

identifiable information contained therein other than directory information[20] . . .) of students without . . . written consent.

20 U.S.C. § 1232g(b)(1).

FERPA defines "education records" as "those records, files, documents, and other materials that are. . . directly related to a student" and "maintained by an educational agency or institution or by a party acting for the agency or institution."  20 U.S.C. § 1232g(a)(4)(A); *see also* C.F.R. § 99.3.  FERPA does not define what it means for an education record to be "directly related" to a student, but the DOE provides guidance as it relates to videos.  It suggests relevant factors to consider in determining whether a video is directly related to a student, including (1) whether the school used the video for disciplinary action involving the student, including the victim of any such disciplinary action; (2) whether the video contains depiction of an activity that resulted in the school's use of disciplinary action, shows a student in violation of law, or shows a student getting injured, attacked, victimized, ill, or having a health emergency; (3) whether the person taking the video intends to make a specific student the focus of the video; or (4) whether the audio or visual content of the video otherwise contains personally identifiable information contained in a student's record.  *See Protecting Student Privacy:  FAQs on Photos and Videos under FERPA*, U.S.

---

[20] FERPA defines "directory information" as

the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student.

20 U.S.C. § 1232g(a)(5)(A).

DEP'T OF EDUC., https://studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa [https://perma.cc/Z72K-BX72].

Under FERPA, "personally identifiable information" includes, but is not limited to:

(a) The student's name;
(b) The name of the student's parent or other family members;
(c) The address of the student or student's family;
(d) A personal identifier, such as the student's social security number, student number, or biometric record;
(e) Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name;
(f) Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or
(g) Information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates.

34 C.F.R. § 99.3 (citing 20 U.S.C. § 1232g as authority).

Here, the parties do not dispute that the District maintains the videos at issue. And each video shows C.S.A. as the victim of HIB conduct. Indeed, the District used the November 19 videos in a disciplinary hearing against A.S. for HIB conduct toward C.S.A. So, the videos are directly related to C.S.A. and amount to his education records. As a result, FERPA entitles C.S.A. to inspect and review the videos.

Still, the District argues it could not provide the videos to C.S.A. unredacted because they also contained personally identifiable information from the education records of other students. We disagree.

17

If an education record contains protected information of more than one student, a parent may generally inspect and review the specific information about only his or her own child. 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.12(a). But a parent may review their child's education record, even if it contains information that is also directly related to another student, "if the information cannot be segregated and redacted without destroying its meaning." 73 Fed. Reg. 74,832-33 (2008).

Here, the videos of the November 19 incident contained identifiable images of A.S., and the school used them as evidence of HIB behavior at her disciplinary hearing. As a result, the November 19 videos are directly related to A.S. and amounts to her education record.[21] But the District concedes that redaction of A.S. "destroyed the meaning of the [November 19] videos." So, FERPA did not exempt C.S.A. from inspecting and reviewing the unredacted video. Indeed, the District allowed C.S.A. to view the videos in their unredacted form shortly after his request.

The District argues that the DOE's Letter to Wachter compels a different outcome. In that letter, the DOE applies FERPA to a similar set of facts. There, a school district asked the DOE whether video footage of a hazing incident

---

[21] Neither the trial record below nor the record designated on appeal show that the March 28 or April 25 videos depicted students for whom the District used as evidence at disciplinary hearings or were otherwise directly related to students other than C.S.A. As a result, the District fails to show that those videos amount to other students' education records under FERPA. Instead, the District seems to suggest that FERPA compels redaction of any personally identifiable information of every student depicted in the videos. This is not so. FERPA protects from disclosure personally identifiable information from only a student's education record. 20 U.S.C. § 1232g(b)(1). And a video can be an education record of only a student to whom it directly relates. 20 U.S.C. § 1232g(a)(4)(A)(i).

involving eight students amounted to an education record of all the students involved, and whether the district may release the video to a parent of an involved student without consent of the others. Letter to Wachter, *supra*, at 2.

Analyzing those questions, the DOE first concluded that the surveillance videos were education records of the eight students involved because they were (1) maintained in the students' disciplinary files by school administration, rather than law enforcement, (2) directly related to the hazing incident, and (3) used by the school to discipline the students who perpetrated the hazing. Letter to Wachter, *supra*, at 4. The DOE recognized that under the preamble to FERPA, "when an education record contains information on more than one student," a parent seeking his or her child's education records "may inspect and review or 'be informed of' only the specific information about his or her own child, unless the information about the other student or students cannot be segregated and redacted without destroying its meaning." *Id.* at 3-4. The DOE concluded that "the parents of the alleged perpetrator to whom the video . . . [is] directly related [and the two victims] . . . would have the right under FERPA to inspect and review information in the video," even though the video has information that is also directly related to other students, "so long as the information . . . cannot be segregated and redacted without destroying its meaning." *Id.* at 4.

Nothing in the DOE's Letter to Wachter exempts production here. Like the facts in the letter, the videos C.S.A. requested amount to his education records. And, while the November 19 videos also amount to A.S.'s education record, the District concedes that redaction of A.S.'s personal information from that record

19

destroyed its meaning. So, C.S.A. has the right under FERPA to inspect and review information in the videos, even though they also contained personally identifiable information from A.S.'s education record.

Because FERPA did not exempt production of the videos to C.S.A., the District fails to show that it amounts to an "other statute" justifying its decision to withhold them under the PRA.[22]

3. Reasonable Diligence

C.S.A. argues that the District's "lengthy delay" in producing the November 19, March 28, and April 25 videos violated the PRA.[23] We agree.

On a request for identifiable public records, an agency must make them "promptly available." RCW 42.56.080(2). That is, agencies must respond with reasonable diligence to a public records request. *Andrews*, 183 Wn. App. at 653. Whether an agency was reasonably diligent in responding to a records request or ignored a request for an extended period of time is a factual issue. *Cantu*, 23 Wn. App. 2d at 88. In determining whether an agency worked diligently on a request, "we apply an objective standard from the viewpoint of the requester." *Id.*

---

[22] We note that FERPA calls for a parent's right to inspect or review records but does not require a school to provide copies of education records. *See* 20 U.S.C. § 1232g(a)(1)(A), (B); *see also* 34 C.F.R. § 99.10(d). But providing a copy of a video without the consent of affected students does not violate FERPA if the parent requesting the video would otherwise have the right to inspect and review the video under FERPA. *See Protecting Student Privacy: FAQs on Photos and Videos under FERPA*, *supra*; *see also Doe ex rel. Roe*, 185 Wn.2d at 372-73 (the PRA's "other statute" exemption applies to only those exemptions explicitly identified in other statutes).

[23] C.S.A. also argues that the District violated the PRA by failing to produce the hallway videos he requested more than two months after the November 19 incident. We disagree. The District explained that it has a 30-day retention policy, so those videos no longer existed by the time C.S.A. made his request. And under the PRA, an agency has "no duty to create or produce a record that is nonexistent." *Bldg. Indus. Ass'n of Wash. v. McCarthy*, 152 Wn. App. 720, 734, 213 P.3d 196 (2009).

at 94. This standard considers prior requests by the plaintiff and communication between the requester and the agency. *Id.* And we consider the totality of the circumstances to determine whether the District was providing " 'the fullest assistance to inquirers and the most timely possible action on requests for information.' " *Id.* (quoting RCW 42.56.100).

A. November 19, 2021 Protest Videos

The record shows that on December 20, 2021, C.S.A. submitted to the District a PRA request for "all video / photographic evidence of the Riot and related events, including but not limited to footage of both the outside events and the inside events."[24] The letter explained that "for clarity, the term 'Riot' refers to the protest / walkout / riot that occurred at Newport High School on November 19, 2021, including any related events before and after."

The next day, December 21, the District acknowledged C.S.A.'s letter as a request for records under the PRA. It provided that C.S.A.'s "request is likely to be handled in a series of installments." And it estimated that it would produce the first installment of disclosures on February 1, 2022. Because the District responded to C.S.A.'s request within five business days and provided a

---

[24] C.S.A also made a general request of the District on December 14, 2021 when he sent the superintendent a letter requesting the District to "[p]reserve and produce any and all videos, photographs, and or records pertaining to the November 19 riot." C.S.A. explained that "this letter focuses solely on addressing the immediate safety threats" to C.S.A. at the school and that "[a]dditional issues will follow." He did not state that he was making his request under the PRA. Accordingly, it was not a PRA request. *Cantu*, 23 Wn. App. 2d at 81-82 (party seeking documents must, at a minimum, provide notice that the request is made under the PRA); *see also Wood*, 102 Wn. App. at 878-79 (ambiguous letter requesting " 'information' " and " 'documentation' " related to employment is not a request for an "identifiable public record," lacked meaningful description, and failed to adequately give notice of a PRA request).

reasonable estimate of the time it would take to produce the first installment, it satisfied its initial obligations under RCW 42.56.520(1)(c).

Then, on December 30, 2021, the District emailed C.S.A. and disclosed that there were two types of videos relevant to his request:

> District surveillance videos prior to event. There are approximately [three]-[four] videos of students posting posters about the Nov[.] 19 event, both in the two days leading up to, and on the morning of, the Nov. 19 event. . . . They are soundless. They merely show students carrying posters through the halls and posting them.

And:

> District surveillance videos during event. There are several camera views that captured the gathering of students, both outside and inside Newport High School, between approximately 10:00 [a.m.] and 1:00 [p.m.] on Nov. 19. They are soundless. They are huge files. You are welcome to view them at the District at an appropriate time to be agreed upon.

But the District asserted that it would not produce the videos because "[m]any of the items [C.S.A.] requested would NOT be disclosable" under the PRA because they show "clearly-identifiable students" or "unrelated student images (attendees who did not participate in leading the protest)." Still, it offered C.S.A. to view the videos at the District office under its policy 3231 and procedure 3231P, which govern disclosure of information in health and safety emergencies.[25] And it explained he could view the videos "under the parameters contained in [the DOE's] Letter to Wachter."

---

[25] The policy and procedure language mirrors the language of FERPA's health and safety exemption. *See* 20 U.S.C. § 1232g(h)(1).

C.S.A. viewed the videos under those conditions in January 2022. But there were problems with two of the files "load[ing]," and the District provided no interior videos. Then, between January and December 2022, the District took no action on C.S.A.'s PRA request. Finally, on December 13, 2022, it produced to C.S.A. redacted footage of the protest inside and "useless" blurred footage of the outside the school. Over that year, the District did not communicate with C.S.A. about why it delayed production of the videos.

Because the District had no lawful basis to withhold production of the videos and it did not provide them in their unredacted form, it failed to respond to C.S.A.'s PRA request with "the fullest assistance" and with "the most timely possible action." RCW 42.56.100.

B. March 28, 2022 HIB Videos

On March 29 and 30, 2022, C.S.A. made public records requests to the District, asking for surveillance footage of the March 28 parking lot HIB incident and related records. On April 6, 2022, he updated his request to include interior and exterior videos. The District timely acknowledged receipt of C.S.A.'s requests and sought clarification about what records he was seeking. Between April 8 and April 15, 2022, the parties emailed back and forth about the scope and intent of the request. Then, on April 15, C.S.A. sent the District a letter identifying 17 categories of requested documents, including documents related to "[t]he March 28, 2022 HIB complaint."

On May 2, 2022, the District notified C.S.A. that it would respond to his records request on an installment basis, with the first documents produced by May 13, 2022. In its message, the District told C.S.A. that some records are likely protected by FERPA. But it did not specifically identify the videos as being protected by FERPA.

On May 11, 2022, the District confirmed that it would produce its first installment of records on May 13, 2022. But on May 13, the District informed C.S.A. that "extended [I]nternet access interruptions" affected its ability to process public records requests. It extended the estimated production date to May 17, 2022. But on May 17, the District produced an installment of records that did not include the videos and estimated that the next installment would be made on or before June 3, 2022.

On June 3, the District wrote C.S.A. that "[d]ue to high workload in this department and anticipated staff absences, the June 3 estimated date for the next installment . . . will be extended to June 13, 2022." On June 13, the District produced an installment of records that did not include the videos and estimated that the next installment would be produced on or before July 19, 2022. The District produced additional installments on July 20, August 15, and September 7, 2022, but it did not produce the videos.

On September 15, 2022, C.S.A.'s attorney requested a pause of installments due to "personal matters and unavailability." On December 5, 2022, C.S.A. requested that production resume. The District then produced an eighth installment of records on December 13, 2022. Sometime between August and

December 2022, the District obtained the ability to produce redacted video footage. Still, the District did not produce the video in the eighth installment.

Between December 2022 and May 2023, the District produced no records. Then, on May 19, 2023, the District produced to C.S.A. four videos—two redacted and two unredacted—in response to his request. The District explained that it made the redactions "to protect students' identifying characteristics," which it claimed were exempt under RCW 42.56.070(1) and 20 U.S.C. § 1232g(a)(4)(A). The District also provided C.S.A. an exemption log.

Because the District had no lawful basis to withhold the unredacted videos from C.S.A. and did not produce the videos identified in C.S.A.'s request for over a year, it did not use due diligence in responding to his request. Further, the District's justification for its failure to produce any records to C.S.A. between December 2022 and May 2023 due to receiving "an unprecedented number of public records requests" and being "short staffed," explaining that it "worked as diligently as possible to respond to the many requests including the several requests from [C.S.A.]," does not excuse the delay. *See Cantu*, 23 Wn. App. 2d at 94-95 (administrative inconvenience, insufficient allocation of resources, and difficulty in producing records does not excuse lack of diligence in producing records).

The year-plus delay in producing the unredacted videos and the failure to produce all the videos in their unredacted form was not a diligent response to

C.S.A.'s request for videos of the March 28 HIB incident.[26]

  C.   <u>April 25, 2022 HIB Videos</u>

  On May 19, 2022, C.S.A. made a PRA request to the District, seeking "any and all documents related to the April 25, 2022 HIB incident" near the school office, including video footage. On May 23, 2022, the District acknowledged receipt of the request, requested clarification about what incident C.S.A. was referring to, and provided that it would respond in installments, with the first production of documents on June 28, 2022. On May 30, 2022, C.S.A. clarified the request, asking for any video footage related to the incident from inside and outside the school. On June 6 and June 22, 2022, the District asked for further clarification about what C.S.A. meant by "the incident." On June 28, 2022, the District notified C.S.A. that it would extend the original first installment estimate, as it was still waiting for clarification from C.S.A. about the definition of the term "incident." The next day, the District gave a new estimated production date of July 28, 2022, pending receipt of the clarification. On June 30, C.S.A. wrote to the District that the "incident" referred to his report of harassment on April 25, 2022. The District accepted that clarification.

---

[26] C.S.A. also argues that the District violated the PRA in its response to his request for the March 28 videos because it provided various times for installment production but did not comply with its own deadlines, and later ceased communicating with him, providing no reasonable estimate of time for the release of the videos. That the District modified its estimated installment delivery dates does not amount to a PRA violation. "The PRA contains no provision requiring an agency to strictly comply with its estimated production dates." *Andrews*, 183 Wn. App. at 651. And the record shows that the District communicated the reason for most of the delays to C.S.A. These do not amount to PRA violations.

On July 29, 2022, the District disclosed to C.S.A. the existence of three videos that were part of the investigation file related to the April 25 HIB incident. But the District noted that it would not produce the videos because they contained personally identifiable information of other students, claiming that they were exempt from production under RCW 42.56.230(1), .070(1), and FERPA. It said that it would allow C.S.A. to inspect and view the videos but that it could not provide copies under the PRA.

The record shows that the District timely acknowledged C.S.A.'s request and set dates for disclosure. And it identified records relevant to his request. But it never produced them to C.S.A. And, as discussed above, because the District fails to show the records are exempt from production under FERPA, the delay in producing the videos to C.S.A. violated the PRA.

In sum, the District violated the PRA because it was not diligent in producing the November 19, March 28, and April 25 videos to C.S.A. We reverse the trial court's orders and remand for the court to determine costs, attorney fees,[27] and appropriate daily penalties. *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 728, 261 P.3d 119 (2011) (remanding to the

---

[27] C.S.A. asks for attorney fees and costs under RCW 42.56.550(4), which awards attorney fees to "[a]ny person who prevails against an agency in any action in the courts seeking the right to inspect or copy any public record or the right to receive a response to a public record request within a reasonable amount of time." Because we reverse and remand for the trial court to determine what, if any, penalty is appropriate for the District's PRA violations, we also reserve the award of attorney fees for the trial court. RAP 18.1(i).

trial court for a determination of costs, attorney fees, and daily penalties after concluding that an agency violated the PRA).

Brenner, J

WE CONCUR:

Mann, J.

Dwyer, J.